IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI


| | |
|---|---|
| United States of America, ex rel. Norma Lorraine Shillcutt<br>Relator/Qui tam Plaintiff<br><br>Vs.<br><br>Richard DeStephane<br>Serve:  Richard J. DeStephane<br>       17 W. Lockwood<br>       St. Louis, MO  63119<br><br>Brunswick Park Associates, Inc<br>Serve:  Richard J. DeStephane<br>       17 W. Lockwood<br>       St. Louis, MO  63119<br><br>TLG II, LLP<br>Serve:  Richard J. DeStephane<br>       17 W. Lockwood<br>       St. Louis, MO  63119<br><br>Sedalia Associates, LP<br>Serve:  Richard J. DeStephane<br>       17 W. Lockwood<br>       St. Louis, MO  63119<br><br>Reliant Care Group, LLC<br>Serve:  Richard J. DeStephane<br>       17 W. Lockwood<br>       St. Louis, MO  63119<br><br>Four Seasons Living Center, LLC<br>Serve:  Richard J. DeStephane<br>       17 W. Lockwood<br>       St. Louis, MO  63119<br><br>Reliant Care Management Co., LLC<br>Serve:  Richard J. DeStephane<br>       17 W. Lockwood<br>       St. Louis, MO  63119 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**TO BE FILED IN CAMERA
AND UNDER SEAL**


Case Number 06-4027-CV-C-SOW

RJDMGR, Inc )
Serve:  Richard J. DeStephane )
      17 W. Lockwood )
      St. Louis, MO  63119 )
       )

Reliant Care Group of Sedalia, Inc. )
Serve:  Richard J. DeStephane )
      17 W. Lockwood )
      St. Louis, MO  63119 )
       )

Reliant Care Levering LLC )
Serve:  Richard J. DeStephane )
      17 W. Lockwood )
      St. Louis, MO  63119 )
       )

Richard Shillcutt )
Serve:  Place of Employment )
      Four Seasons Living Center )
      2800 Highway TT )
      Sedalia, Mo 65301 )
       )

Pharmco Missouri, LLC )
Serve:  David Smith )
      1 McKnight Place )
      St. Louis, MO  63124 )
       )

Sharon Miller )
Serve:  Place of Employment RCMC )
      17 W. Lockwood )
      St. Louis, MO  63119 )
       )

Ricky S. Mofsen, DO
Serve: 8130 Westmoreland Ave.
      St. Louis, MO  63105

Clinical Research, Inc.
Serve: 8130 Westmoreland Ave.
      St. Louis, MO  63105

## QUI TAM RELATORS COMPLAINT UNDER 31 U.S.C. § 3729, FEDERAL FALSE CLAIMS ACT

Comes Now Relator, by and through her counsel of record, and for her cause of action against the defendants states to the Court as follows:

1) This is an action to recover damages and civil penalties on behalf of the United States of America arising out of the false claims presented for payment by the defendants under the Federal Medicare and Medicaid Programs. This action arises under the provisions of Title 31 U.S.C. § 3729, et seq, popularly known as the False Claims Act which provides that the United States District Courts shall have exclusive jurisdiction of actions brought under that Act.

2) Section 3732(a) of the Act provides that "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

3) Defendant Reliant Care Group, LLC., is a Missouri Limited Liability Company with its principal place of business at 17 W. Lockwood, St. Louis, MO 63119. It maintains a corporate presence and has skilled nursing facilities and provides services in Sedalia, MO at the Four Seasons Living Center. As such it transacts business in Sedalia, MO, and is subject to the venue provisions of Section 2723(a) and this action may be brought in the Central Division of the United States District Court for the Western District of Missouri, located in Jefferson City, Missouri.

4) Under the terms of the Act, this complaint is to be filed in camera and under seal and is to remain under seal for a period of at least sixty days and shall not be served on the defendants until the Court so orders. The Government may elect to intervene and proceed with the action within the sixty day time frame after it receives both the complaint and the material evidence submitted to it.

## PARTIES TO THE ACTION

5)   Relator and Qui Tam Plaintiff Norma Lorraine Shillcutt, is a citizen and resident of Missouri and brings this action on behalf of the United States Government, and will hereinafter be referred to as "Relator."   She is a former employee of Four Seasons Living Center and Reliant Care Group, LLC, and at various times and various places worked for the multiple defendants in the position of marketing and public relations.  She brings this action as a relator with personal knowledge of the wrongdoing by the defendants and their shell corporations, having first voluntarily disclosed this information to the federal government by providing to the federal government a disclosure of substantially all the information in her possession relating to the claims of fraud at issue here.

6)   Defendant Richard DeStephane is the owner and sole shareholder in a group of shell corporations used by DeStephane to avoid and obfuscate his ownership, management, and control of a series of nursing homes in Missouri.   He is also the registered agent for service of process for several of the defendants in this action. His service address is 17 W. Lockwood Ave., St. Louis, MO  63119.

7)   Defendant Four Seasons Living Center LLC, (formerly Reliant Care Four Seasons LLC) is, on information and belief, the shell LLC (and alter ego of Defendant Richard DeStephane) that operates the Four Seasons Living Center, a skilled nursing facility just outside Sedalia, MO. Its registered agent for service of process is Richard J. DeStephane, 17 W. Lockwood Ave., St. Louis, MO  63119

8)   Defendant Reliant Care Group, LLC, (hereafter RCG) on information and belief, is the shell LLC (and alter ego of Defendant Richard DeStephane) that operates or manages the Defendant Four Seasons Living Center LLC.  On information and belief RCG owns all the shares of Four Seasons Living Center, LLC, and is the sole member of that LLC.  On information and belief the sole member of RCG is Richard J. DeStephane.  Its Manager is an entity formerly known as FSIH, Inc.,

and presently known as RJDMGR, Inc. Its registered agent for service of process is Richard J. DeStephane, 17 W. Lockwood Ave., St. Louis, MO 63119

9) Defendant Reliant Care Management Company, LLC, (hereafter RCMC) on information and belief, is the shell LLC (and alter ego of Defendant Richard DeStephane) that operates or manages facilities on behalf of Reliant Care Group. Its business address is 17-B West Lockwood Ave, St. Louis, MO 63119. On information and belief RCMC is solely owned by Richard J. DeStephane. It's director of operations is defendant Sharon Miller. It has some role, although that role is not readily identifiable, in the operation and management of Four Seasons Living Center. This shell legal entity is the alter ego of Richard J. DeStephane. Its registered agent for service of process is Richard J. DeStephane, 17 W. Lockwood Ave., St. Louis, MO 63119

10) Defendant Sedalia Associates, LP is a limited partnership that owns the land and property of Four Seasons Living Center. Sedalia Associates has a general partner and a limited partner. The general partner is Brunswick Park Associates, Inc. The limited partner is TLG II, LLP. On information and belief Sedalia Associates LP is a limited partnership that was developed specifically to own the real estate as a fraud on the creditors of Four Seasons Living Center such that in the event Four Seasons was held liable in civil court for fines or civil penalties in any action of this type, there would be no real assets to seize. Defendant Sedalia Associates receives, on information and belief, $30,000 per month in "rental" payments from Four Seasons Living Center LLC. This shell legal entity is the alter ego of Richard J. DeStephane. Its registered agent for service of process is Richard J. DeStephane, 17 W. Lockwood Ave., St. Louis, MO 63119

11) Defendant Brunswick Park Associates, Inc., is a Missouri Corporation in good standing whose place of business is unknown but who is the general partner in Sedalia Associates, LP. Richard DeStephane was, on information and belief, a

42% owner of Brunswick Park Associates, Inc. However, on information and belief, he may now own almost 100% of the stock of this company. This shell legal entity is the alter ego of Richard J. DeStephane. Its registered agent for service of process is Richard J. DeStephane, 17 W. Lockwood Ave., St. Louis, MO 63119.

12) Defendant TLG II, LLP, is a Limited Liability Partnership, where, on information and belief, Richard J. DeStephane owns at least 42% and likely a greater percentage of the entity. It is the limited partner in the Sedalia Associates LP, venture. This shell legal entity is the alter ego of Richard J. DeStephane. Its registered agent for service of process is Richard J. DeStephane, 17 W. Lockwood Ave., St. Louis, MO 63119.

13) Defendant RJDMGR, Inc., formerly known as FSIH, Inc., is a Missouri corporation with an unknown place of business. This shell legal entity is the alter ego of Richard J. DeStephane. It is the sole manager of Reliant Care Group, LLC. Its registered agent for service of process is Richard J. DeStephane, 17 W. Lockwood Ave., St. Louis, MO 63119.

14) Defendant Reliant Care Levering, LLC, is a limited liability company registered and transacting business in Missouri with its principal place of business in Hannibal, Missouri. This shell legal entity is the alter ego of Richard J. DeStephane. Its registered agent for service of process is Richard J. DeStephane, 17 W. Lockwood Ave., St. Louis, MO 63119.

15) Defendants in paragraphs 6 through 14 are sometimes called the DeStephane Group of defendants.

16) Defendant Pharmco Missouri, LLC, is a Missouri Limited Liability Company whose registered agent is David Smith, 1 McKnight Place, St. Louis, 63124. On information and belief there is a relationship and series of business arrangements (including kickbacks) between Pharmco Missouri, LLC, and the DeStephane

Group of defendants. On information and belief, Defendant DeStephane owns a portion of this LLC, although that ownership does not show up on the Secretary of State's information.

17) Defendant Richard Shillcutt was for all relevant times the administrator of Four Seasons Living Center, and is now the Senior Administrator/Regional Specialist working for Reliant Care Management Company, LLC. Defendant Shillcutt splits his time between Chariton Park Health Care Center, LLC, and Four Seasons Living Center in Sedalia. He is an employee of Reliant Care Management Company, and a close personal friend of Defendant DeStephane. He conspired with DeStephane and with other corporate entities owned by DeStephane to engage in acts of profiteering from Medicare and Medicaid. Prior to working for DeStephane Shillcutt learned how to milk the Medicare and Medicaid systems as an employee of Morris Esformes, a notorious Midwest nursing home owner and operator.

18) Defendant Sharon Miller is the director of operations for Reliant Care Management Company, LLC, and is also a co-conspirator with DeStephane and Richard Shillcutt.

19) Defendant Ricky S. Mofsen, DO is a psychiatrist and the president of Clinical Research, Inc. At all times relevant in this complaint Dr. Mofsen was employed at or located at Reliant Levering Care and was the medical director of the facility. He can be served with process at his place of employment which is 8130 Westmoreland Ave, Clayton, MO 63105.

20) Defendant Clinical Research, Inc., is the corporation wholly owned by Defendant Mofsen and through which the clinical trials referenced below were conducted or performed. It can be served with process through its registered agent , Ricky S. Mofsen, DO, at 8130 Westmoreland Ave, Clayton, MO 63105.

21)      Mofsen, Clinical Research, Inc., and Reliant Levering Care are sometimes referred to as the CLINICAL STUDY defendants.

## BACKGROUND FACTS

22)      Richard DeStephane is the corporate architect of a corporate structure of businesses that are designed to frustrate creditors and to wash the profits of various nursing home operations through different shell corporations and limited liability companies so as to conceal financial relationships that violate the Antikickback Statute and Medicare and Medicaid rules and regulations.

23)      Richard DeStephane hired Richard Shillcutt in December, 1997 as the Administrator of the Four Seasons Living Center. Shillcutt had previously worked for another nursing home provider and was brought in to Four Seasons to "clean up and turn around" the facility after bad nursing home surveys, several patient deaths, a rape and sexual assault all occurring at the Four Seasons Living Center facility.

24)      Richard Shillcutt and Richard DeStephane hired N. Lorraine Shillcutt, relator in this action to handle publicity and help neutralize the negative publicity associated with the patient deaths, patient rapes, and poor reputation. Richard and Lorraine had been married for several years before they agreed to work together at Four Seasons Living Center.

25)      Lorraine had been a witness first hand to the operation of a nursing home prior to going to work at Four Seasons, having worked in various positions in health care and long term care since 1988. What she found when she started working at Four Seasons began to trouble her.

26)      Through the media, through her own research, and by attending mandatory company meetings and monthly training seminars, Lorraine became aware that

Medicare and Medicaid regulations sought to preserve as much freedom of choice for nursing home residents as possible. She knew from her research and knowledge of resident's rights that the home could not dictate who the residents used as their physician and who they used to provide other ancillary services like pharmacy and hospice.

27) In her job as public relations and marketing person, she was told to market the facility to other health care facilities (hospitals, physicians etc.) and to promote Four Seasons fully. When potential residents or their family members came to tour or decide on the facility, Lorraine's job was to "sell them a used car." She was supposed to talk up the facility and convince them of the merits of the facility using all the tools at her disposal.

## A – THE PHARMCO PHARMACY FRAUD

28) After she began performing in this job she learned that it was company policy (passed along verbally and never to be reduced to writing) to require every new patient to chose Pharmco Missouri (defendant herein) for their pharmacy even if they had a longstanding relationship with Fifty-Plus Pharmacy, Wal-Mart Pharmacy, or some other retail pharmacy in the area. The rationale explained to Shillcutt and others what the the medications came bubble-packed as required for long term care. Shillcutt discounted this explanation in view of the fact that VA medications routinely came in bottles, not unit-dose med packets[1].

29) No alternate choice was provided, and no alternate choice was tolerated for any patient who had Medicare or Medicaid as the primary payor.

---

[1] The Veterans Administration cancelled its contract with Four Seasons for failure to comply with providing patient services under the terms of the VA Contract.

30) If a patient complained about the pharmacy billings, they were told that Pharmco was the only provider that could be used. If they complained loudly enough, and they were private paying patients, alternate pharmacy arrangements would be made *sub rosa* for the patient.

31) If a patient complained about the price of a drug obtained from Pharmco, and supplied evidence from another pharmacy that the drug could be obtained more cheaply, then that drug was provided at the lower rate for that patient only. The savings were not generalized to all patients receiving that drug.

32) According to Richard Shillcutt, Richard DeStephane personally issued the mandate that only Pharmco Missouri could be used.

33) DeStephane would hold meetings of all Reliant Care managers at Innsbrook in Warren County, Missouri. During those meetings when individual nurses and administrators would complain that drugs could be purchased for less at other pharmacy centers, DeStephane would reiterate that all sales were to go through Pharmco.

34) Pharmco was not restrained by a 30 day or 15 day prescription for drugs. Pharmco would routinely dispense 90 days of medication for patients whose drugs were paid for by Medicare or Medicaid. When those patients were transferred, sent to the hospital, or expired, Pharmco drugs were not returned, or, if they were returned, on information and belief, no credits were issued to the Medicare or Medicaid programs for the unused drugs.

35) An audit of admission records at Four Seasons from 2000 through 2005 would show that Pharmco was written into the pharmacy line every time a patient was admitted to the facility during that time, unless they were a VA Contract Placement or a privately paid patient who knew from prior experience that they could use any pharmacy.

36) On information and believe Pharmco Missouri was paying a kickback in cash or in kind for drug orders from all Reliant Care homes.

37) At some time in late 2004 or early 2005 Pharmco was no longer being used as the provider for Four Seasons and Interlock was substituted as the pharmacy provider.

38) The same "sole source" provider arrangement was mandated for Interlock.

39) Relator, on information and belief, understands that Interlock guarantees a certain amount of money will be returned or paid to Four Seasons Living Center, Richard J. DeStephane, or those acting on his behalf, in exchange for continuing to retain Interlock as its pharmacy provider.

## B – MEDICARE HOLDOVER FRAUD

40) Medicare pays for 100 days of skilled nursing care for a patient coming to a skilled nursing facility from a hospital and recovering from an acute illness.

41) The 100 days of care are provided for rehabilitation from acute illness, and not for maintenance or stable conditions.

42) The chief forms of rehabilitation at the skilled nursing facility are physical therapy, occupational therapy and speech therapy.

43) Physical therapy is provided to patients who have suffered hip or pelvic fractures, strokes, or other debilitating conditions.

44) Medicare pays a higher rate for nursing home services than does Medicaid.

45) Medicare pays for skilled physical therapists to evaluate and treat patients in these skilled nursing beds, but requires that when a patient's point of maximal medical improvement is reached, that the patient must be discharged from Medicare even if they cannot be discharged from the skilled nursing facility.

46) In the case of a patient whose primary payor is Medicaid, retaining a patient in Medicare status rather than transferring them to Medicaid status can mean hundreds of dollars a day in additional remuneration to the nursing facility.

47) Physical therapists[2], the MDS Coordinator, social workers and Medicare case maangers working for Four Seasons Living Center were told by Richard Shillcutt and Richard DeStephane in no uncertain terms that no patient was ever to be discharged from Medicare on a Friday, even if they had reached the point where discharge was the appropriate thing to do.

48) Physical therapists were told that they must hold that patient over in Medicare status until the next Monday, when they could be discharged.

49) A statistical analysis of Medicare discharges between 2000 and 2005 will show that there are almost no discharges from Medicare on Thursday or Friday, and that all such discharges occur on Mondays (unless the 100th day fell in such a way that would prohibit the carryover until Monday).

50) This is the result of a policy designed by Richard DeStephane and implemented by Richard Shillcutt to add Medicare days and improve the bottom line in a manner that would be unlikely to be detected by HHS OIG.

51) At least one physical therapist quit as a result of this practice when she refused to comply with Shillcutt's direction to discharge patients only on Mondays.

## C – HOSPICE PROGRAM FRAUD

52) Pharmacy Services are not the only services in which a patient is mandated to have a choice of provider.  Hospice services are likewise supposed to be offered to residents without a mandate as to the choice of provider.

---

[2] Physical therapists were actually employed through Enduracare Therapy Services LLC

53) Two hospices serve the Sedalia Area. One is located in Sedalia, and is run from Bothwell Regional Medical Center. The Bothwell Hospice does not have any relationship with the staff or individuals at Four Seasons Living Center.

54) Prior to 2003 residents at Four Seasons, when their conditions warranted, were made aware of Bothwell's service. At some time in 2004 the Director of Nursing notified all staff that only the Jefferson City Hospice would be used.

55) Relator objected because she felt that patients and residents should be told that there was a local Sedalia-based provider who could possibly be more responsive to their needs than a hospice that had to come from Jefferson City, nearly 50 miles away.

56) Relator was told that her objections were unimportant, and that all care would be run through the Jefferson City Hospice, and that there was no more discussion on this topic.

57) When she pressed the issue with the Director of Nurses she was told that Bothwell Hospice refused to provide tangible items for her staff, and that the Hospice of Jefferson City provided meals, including barbecues, for the Four Seasons Staff, and that as a result, they (and only they) would get the business.

58) Relator explained that this was a violation of Antikickback legislation in that the DON was accepting remuneration in kind (in the form of food and services) from a provider of care that would ultimately be reimbursed under Medicare. She specifically told Richard DeStephane, the Director of Nursing, and the Administrator, Richard Shillcutt, that this was unlawful and could potentially be criminal. She refused to comply with the direction.

59) As a result of her refusal to comply, and as a result of her standing up to her husband, she was terminated.

60) Her husband later physically assaulted her, choking her, and threatening her with physical harm if she took her concerns about Hospice or other regulatory matters to the authorities.

61) Lorraine Shilcutt filed for divorce, took out an order or protection, and sought legal advice on this issue.

## D -- COST REPORT FRAUD

62) Skilled Nursing Facilities (SNF) are required to submit cost reports on an annual basis.

63) The cost report is the basis for providing reimbursement and figures into the average daily rate.

64) By charging residents inflated costs for pharmacy, the costs of care are increased and the Medicare Cost Report shows higher per-patient costs than would have been the case had the facility simply used the most cost-efficient providers.

65) In addition, salary costs figure into the cost report, and are an item of expense that is reimbursed to the facility.

66) Management fees and expenses are items of expense that are reimbursed under the Medicare Cost Report.

67) Management staff are in the facility no more than five times yearly, and Mr. DeStephane is rarely in the facility. All management is locally directed by Shillcutt, who in 2003 was paid a bonus of $10,000 for retaining HUD funding for the facility by using "whatever means necessary."

68) On information and belief "management fees" paid to Reliant Care Group, Reliant Care Management Company, and other DeStephane Defendants are in fact no more than pass-throughs of profit to DeStephane personally, and are not a value-for-value transaction whereby the Skilled Nursing Facility actually benefits from

the "management" of the corporate entity, but instead allow for the payment of these fees to be shown as an item of expense reimbursable under Medicare and Medicaid.

69) One item of expense, on information and belief, that will be charged to Medicare and reflected as either a legal expense or some item of cost or salary is the voluntary payment, by Richard J. DeStephane or those acting on his behalf of the $15,000 in legal expenses incurred by Richard J. Shillcutt for prosecution of his divorce and defense of his domestic assault charges.

## E – FALSE STATEMENTS TO MEDICARE AND MEDICAID TO ENSURE CERTIFICATION AS PROVIDERS

70) Medicare and Medicaid program rules require Defendants to maintain full compliance with the applicable provisions of the Code of Federal Regulations (Chapter 483) and with the Code of State Regulations promulgated under Chapter 198, RSMo. (1999).

71) Medicare and Medicaid providers cannot submit claims for reimbursement of services when those services "[fail] to meet professionally recognized standards of health care." See, e.g., 42 U.S.C. § 1320c-5(A)(2); 42 USC § 1320a-7b(a)(1)(3)(providing for criminal sanctions when a provider submits a claim it has no right to submit).

72) 42 U.S.C. § 1396(r)(b) requires a nursing facility receiving funds from the federal government to "care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident."

73) 42 U.S.C. § 1396(r)(d)(4)(A) mandates nursing facilities "must operate and provide services in compliance with all applicable Federal, State and local laws

and regulations and with accepted professional standards and principles which apply to professionals providing services in a facility."

74) The Social Security Act requires that skilled nursing facilities participating in the Medicare and Medicaid program meet certain requirements in order to qualify for payment and these requirements are set forth in 42 CFR § 483.1 et seq. and "serve as the basis for survey activities for the purpose of determining whether a facility meets the requirements for participation in Medicare and Medicaid."

75) Specific provisions of the Code of Federal Regulations and the Code of State Regulations require that certain standards be met in terms of providing care that prevents pressure sores, enhances nutritional status, and prevents injury to residents. See generally 42 CFR §§ 483.10, 483.25, 13 CSR 15-14.042(72); 13 CSR 15-14.042(37); 13 CSR 15-14.042(71);

76) There must be adequate staffing in the facility.  42 CFR § 483.30(a)(1).

77) The professional charged with seeing to it that the facility complies with these regulations is the director of nursing and the administrator of the facility.

78) Defendants make contractual representations to the United States that they will be responsible for all Medicare claims submitted to HCFA and that they will submit claims that are accurate, truthful and complete.  Defendants further acknowledge in their contractual agreements that they will receive payment from federal funds and that they can be held criminally liable for false claims or misrepresentations.

79) The Medicare provider agreement mandates that Defendants will maintain adequate medical records that can be verified by audit and that such records, if not maintained adequately, may result in sanctions against the provider.

80) Prior to 2004 Four Seasons Living Center had a rash of very bad incidents regarding patient care.

81) Part of the reason that Four Seasons Living Center had so many patient care incidents is that the facility had stripped its staffing to bare-bones minimums.

82) Medicaid and Medicare patients received not just sub-optimal care, but in many cases, worthless care from Four Seasons Living Center.

83) One resident, Kelly Denise Leslie, was supposed to be under the care and supervision of the facility and was required by state regulation to "24 hour protective oversight and supervision." 13 C.S.R. 15-14.042(71).

84) In spite of the requirement for twenty-four hour protective oversight, the resident was able to sneak food into her bathroom.

85) Ms. Leslie was found dead in her bathroom where she choked to death on food that she should never have been able to obtain.

86) Instead of divulging the circumstances of the death, and reporting it to the state as a death from a known cause or origin, the facility hid the death and did not disclose the true facts to anyone outside the immediate chain of command in the nursing home, including the Director of Nurses and the Administrator, Shillcutt.

87) In one instance a patient named Erin Crenshaw suffered a violent rape and sexual assault as a result of short-staffing in the Traumatic Brain Injury wing of Four Seasons Living Center.

88) As a result of the Crenshaw case, there was an investigation by the Missouri Department of Health and Senior Services.

89) Citations were issued to the facility on the basis of the failure to staff the facility properly.

90) Among the requirements imposed by the state on Four Seasons were the requirements to have sufficient staffing and to equip workers with walkie-talkies to permit help to be summoned in an emergency. Cameras were mandated for the hallways, and those cameras were supposed to be monitored. In addition, a hallway monitor was supposed to be physically present in the wing at all times.

91) Subsequent to agreeing to the plan of correction, and implementing it in time for the next follow-up survey, the facility abandoned the corrective measures imposed by the state.

92) Instead of complying with the plan of correction, the facility merely increases its staffing and orders the use of the walkie-talkies for that brief period of time when it can be discerned that the state will likely reinspect the facility.

93) It is company policy to not implement the plan of correction.

94) Essentially, the facility submitted a false or fraudulent document, specifically, a plan of correction, to the State of Missouri, in order to retain its license.

95) If the State of Missouri determines that the facility is not in compliance with a plan of correction, it can revoke or rescind its authority to admit Medicare and Medicaid patients.

96) The certification to have Medicare and Medicaid patients is a prerequisite to billing Medicare or Medicaid for nursing home services.

97) The federal government, acting through state surveyors who track compliance with federal regulations, relies on the representations made to the state in continuing to pay Medicare and Medicaid claims.

98) From at least 1998 to present, the facility has not been in full compliance with its plans of correction.

## F – TRADING PLACES: SHUTTLING RESIDENTS BETWEEN FACILITIES FOR FUN AND PROFIT

99) Four Seasons Living Center and Reliant Care Levering LLC in Hannibal are both managed by Reliant Care Management Company, (RCMC) and have similar corporate structures to Four Seasons.

100) Each corporate entity pays large amounts through shell corporate entities to Richard J. DeStephane and shields these payments through a hodge-podge of corporate entities and limited liability companies.

101) The purpose behind this shell game of companies is to protect DeStephane's substantial assets from creditors.

102) Reliant Care Levering (RCL) is a facility that is predominantly oriented toward behavioral care, although, all six Reliant Care facilities known to Relator have behavioral medicine wings.

103) RCL and indeed most Reliant facilities, take the behaviorally-disordered patients from psychiatric hospitals and psychiatric referral services that other facilities will not take.

104) At some time in late 2004 Ricky Mofsen, DO, and Clinical Research Inc., began implementing plans for clinical trials of medication on psychiatric/behavior patients at Reliant Levering Care.

105) Part of his ability to do the study depending on a sufficient census of patients to "experiment" on.

106) Staff at Four Seasons were told that Dr. Mofsen would select individuals for transport to Levering. These individuals were Medicare or Medicaid patients who did not have local relatives or guardians (or whose guardian was the Public Administrator) and whose presence or absence in the facility would not be noticed for long periods of time.

107) Staff was told to provide a list of these types of patients to Dr. Mofsen. As part of the consideration for shipping these patients to Levering, Mofsen, who was conducting the study, would arrange to reimburse the facility for the amount of money that Medicare or Medicaid would have paid to the facility for the time that they were in Hannibal.

108) During their absence from the facility Relator was told Medicare/Medicaid would not be billed by Four Seasons and that Dr. Mofsen and/or Levering would run it through the system. Dr. Mofsen's group would pay the facility the rate that they would have received had that patient been physically in that bed and Four Seasons could rent the bed out to an additional patient and continue to count the "missing patient" on the daily census.

109) On information and belief a kickback arrangement between Clinical Research, Inc., RCL, Four Seasons Living Center, Ricky Mofsen who managed the study, and Richard J. DeStephane existed to facilitate the use of RCL for drug studies.

110) Under both Medicaid and Medicare rules, a patient must be physically present in the facility at midnight for the facility to properly bill the government for a day of care. If patients were out of the facility at midnight for any reason other than hospitalization or transfer, Shillcutt demanded that they be counted as physically present in the facility and billed to Medicare and Medicaid in direct violation of the law.

111) On information and belief residents were not consulted and their wishes were not respected with regard to transport to RCL or participation in the drug studies.

112) On information and belief residents were subjected to various forms of experimentation, including the prescribing of medication, when there was no medical necessity for such treatments, and where such treatment was specifically for the purpose of completing a drug study rather than for rehabilitation or skilled nursing care.

113) The framework for this plan was set into motion in April 2005. Relator was fired before the first transfer, and has been unable to verify that transfers have taken place, but knowing how Reliant and DeStephane operate, strongly believes the program is in full swing.

## G – FALSE CERTIFICATIONS

114) Medicare and Medicaid both require the submission of claims forms for the payment of services rendered to Medicare and Medicaid patients.

115) On information and belief the submission of claims to Medicare or Medicaid is accomplished by submitting a claim form to a fiscal intermediary for payment.

116) Medicare and Medicaid use different fiscal intermediaries.

117) Medicare providers submit an application for a provider number (Form 855A) which includes the following certification:

> 1.) I agree to notify the Medicare contractor of any future changes to the information contained in this form within 90 days of the effective date of the change. I understand that any change in the business structure of this provider may require the submission of a new application.
>
> 2.) I have read and understand the Penalties for Falsifying Information, as printed in this application. I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare, or any deliberate alteration of any text on this application form, may be punished by criminal, civil, or administrative penalties including, but not limited to, the revocation of Medicare billing number(s), and/or the imposition of fines, civil damages, and/or imprisonment.
>
> 3.) I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.
>
> 4.) Neither this provider, nor any 5% or greater owner, partner, officer, director, W-2 managing employee, authorized official, or delegated official thereof is currently sanctioned, suspended, debarred, or excluded by the Medicare or Medicaid program, or

any other Federal program, or is otherwise prohibited from providing services to Medicare or other Federal program beneficiaries.

5.) I agree that any existing or future overpayment made to the provider by the Medicare program may be recouped by Medicare through the withholding of future payments.

6.) I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

118) The certification section of the Medicare portion of the CMS-1500 provides in applicable part: "Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws."

119) The certification of the Medicaid portion of the CMS-1500 provides: "This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

120) Medicare requires providers to certify that they will "abide by the Medicare laws, regulations, and program instructions that apply to this provider."

121) By its conduct Defendants have not complied with all federal laws relating to Medicare.

122) By soliciting kickbacks from hospice providers, they have violated the Antikickback statute.

123) By soliciting and receiving payments from Reliant Care Levering and/or the physician conducting drug studies, they have violated the Antikickback statute.

124) By refusing to permit residents to choose their pharmacy and hospice providers, the defendants have violated Medicare program regulations.

125) Defendants have falsely certified their Medicare Provider Application and their Medicare Claim Forms.

## H – SHELL CORPORATIONS AND FRAUD ON CREDITORS

126) Defendant DeStephane created the corporate entities named above, in addition to a large number of other corporate entities (including LLCs and LLPs) as a fraud on creditors, including the United States Government.

127) The dizzying arrangement of corporate entities and their relationships can be graphically depicted as follows:



# The Connection

Figure One: The Corporate Schema shown above is repeated at each of the six facilities where DeStephane operates.

128) In each instance where money leaves one corporate entity it flows to another

entity owned either exclusively or predominantly by Richard J. DeStepane. That

picture is accurately described by looking at the following graphic



# Follow the Money

Figure Two: Chart of the money trail.

The graphic illustrates that:

a) Four Seasons Living Center LLC is a shell company that holds the license to

operate Four Seasons Living Center. It is solely owned by Reliant Care Group,

LLC. Reliant Care Group has as its sole member Richard J. DeStephane and its

manager RJDMGR, Inc.

b) The Owner of the Property where Four Seasons Living Center sits is Sedalia

Associates, and LP owned in whole by a general partner (Brunswick Park

Associates, Inc) and a Limited Partner (TLG II, Inc.) both of which are controlled by Richard J. DeStephane.

c) Four Seasons Living Center is managed by Reliant Care Management Company, LLC, which has as its sole member, Reliant Care Group, LLC.

d) Claims for Medicare and Medicaid reimbursement are submitted by the Operator, Four Seasons Living Center, LLC, and that entity pays monthly rent to the Owner in the amount of $30,000 per month. DeStephane washes pure profit from the operation of the facility through the owner and the general and limited partnership so as to take $30,000 every month out of the facility.

e) On information and belief a "consulting and management contract" will exist between Reliant Care Management Company, LLC, and Four Seasons Living Center LLC. That agreement will pull out additional money from the facility ostensibly for "management" services. The actual purpose of the payments is to secure a steady stream of cash flow to DeStephane.

f) Whatever small amount of money is left after expenses in Four Seasons Living Center LLC is passed up the chain to Reliant Care Group, LLC, and the entity will, on paper, appear to either break even or turn a small tax loss every year.

g) Reliant Care Group, LLC, and Reliant Care Management Company, LLC, pass profits directly to Richard J. DeStephane or RJDMGR, Inc., which is wholly owned by DeStephane.

129) Through this scheme the nursing home is undercapitalized by intention with the entity providing care maintaining no real assets that can be reached by creditors while the steady and very lucrative profits from that entity are passed up the series of shell corporations directly to DeStephane.

## COUNT I
## VIOLATION OF 31 U.S.C. § 3729(A)(1)
## A CAUSE OF ACTION ASSERTED
## AGAINST THE DESTEPHANE DEFENDANTS
## FOR SUBMISSION OF FALSE CLAIMS TO MEDICARE AND MEDICAID
### (Billing for Holdover Patients)

130) Relator restates, repleads, and realleges and incorporates by reference the contents of paragraphs 1-129 as if fully set forth herein.

131) In Count I defendants means THE DESTEPHANE DEFENDANTS, including Richard J. DeStephane and Richard Shillcutt and the administrators at the five other Reliant Facilities.

132) Defendants jointly and severally submitted or caused others in their employ to submit claims for reimbursement to Medicare in Missouri.

133) Those claims were presented to an officer or agent of the United States by transmitting the claims for reimbursement to a fiscal intermediary for Medicare.

134) The claims were false in that they were based on a false certification of continued therapeutic progress. In fact, the last two to three days of care was given without medical or therapeutic benefit because the patient had progressed to the point of maximum medical improvement, but had not fully exhausted their Medicare eligibility.

135) Defendants, jointly and severally knew that the invoices submitted to Medicare were false in that:

   a) Defendants either knew directly that the claims were false; or

   b) Acted in deliberate ignorance of the truth or falsity; or

   c) Acted in reckless disregard of the truth or falsity of the claims.

136) As a result of billing for Medicare skilled nursing for patients who had reached maximum medical improvement, the federal government was billed in an amount greatly in excess of what should reasonably have been billed.

137) On the basis of the foregoing, the Treasury of the United States of America sustained damaged in an amount to be calculated and proved at trial.

WHEREFORE, Relator Lorraine Shillcutt demands judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, including any alternate remedy, for its court costs and reasonable attorneys fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

**COUNT II**
**VIOLATION OF 31 U.S.C. § 3729(A)(1)**
**A CAUSE OF ACTION ASSERTED**
**AGAINST THE DESTEPHANE DEFENDANTS & PHARMCO MISSOURI**
**FOR SUBMISSION OF FALSE INVOICES**
(Billing for Pharmacy Services)

138) Relator restates, repleads, and realleges and incorporates by reference the contents of paragraphs 1-129 as if fully set forth herein.

139) In Count II defendants means THE DESTEPHANE DEFENDANTS, including Richard J. DeStephane and Richard Shillcutt and Pharmco Missouri.

140) Defendants jointly and severally submitted or caused others in their employ to submit claims for reimbursement to Medicare and Medicaid.

141) Those claims were presented to an officer or agent of the United States by transmitting the claims for reimbursement to a fiscal intermediary for Medicare.

142) The claims submitted were for pharmacy supplies and items of prescription drugs.

143) The claims were false in that the person signing the claim form on behalf of the defendants represented that the charges were truthful when they in fact did not represent the "best price" to Medicare or Medicaid in violation of Medicare "best price" and "excessive price" billing regulations.

144) The claims were false because they did not represent the patient's true choice of pharmacy providers in contravention of federal regulations.

145) The claims were false in that they purported to represent compliance with all federal laws and regulations when in fact the facility submitting the invoices had not complied with federal law by providing a true choice of providers to the resident.

146) Defendants, jointly and severally knew that the invoices submitted to Medicare, Medicaid and CHAMPUS were false in that:

   a) Defendants either knew directly that the claims were false; or

   b) Acted in deliberate ignorance of the truth or falsity; or

   c) Acted in reckless disregard of the truth or falsity of the claims.

147) As a result of billing for pharmacy services at an amount higher than the true "best price" amounts, thousands of prescriptions were billed to Medicare in an amount greatly in excess of what should reasonably have been billed.

148) On the basis of the foregoing, the Treasury of the United States of America sustained damaged in an amount to be calculated and proved at trial.

WHEREFORE, Relator Lorraine Shillcutt demands judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C.

§ 3730(d) of the False Claims Act or any other applicable provision of law, including any applicable alternate remedy provisions, for its court costs and reasonable attorneys fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT III
### VIOLATION OF 31 U.S.C. § 3729(A)(2)
### CREATION OF FALSE RECORDS TO SUPPORT FALSE INVOICES
(Billing for Medicare Patient Care Services)

149) Relator restates, repleads, and realleges and incorporates by reference the contents of paragraphs 1-148 as if fully set forth herein.

150) In billing the Medicare programs for patient care services as outlined in Counts I & II, the DESTEPHANE DEFENDANTS jointly and severally created false records which were false in the following respects:

a) Billing forms showed that patients required skilled rehabilitative care when they in fact did not require that level of care because they had reached the point of maximum medical improvement.

b) Medicare forms were prepared with false certifications that the services provided had been provided in compliance with all regulatory and statutory guidelines.

c) Medical records falsely stated that patients were continuing to improve in spite of the fact that the patient had reached maximum medical improvement. Physical therapists were required to falsify records in order to continue working at Four Seasons Living Center.

d) Medicare forms were prepared that purported to show that these federal health care programs were getting the "best price" for prescription drugs

as required by regulation when in fact they were being billed an amount two to three times the amount of the "best price" by Pharmco Missouri.

e) Admissions contracts were created with blanks to make it appear as though the patient had a choice of providers for Pharmacy Services when in fact every patient was directed to use Pharmco and the "selection" which appeared on the document was the creation of a false record because neither the residents nor their responsible parties actually was given a choice of pharmacy provider.

f) Census figures submitted to state and federal government entities for billing purposes falsely stated that residents were present in the facility at midnight when they were not in fact present at midnight as will be documented by their hospital records.

g) Plans of Correction were submitted to the Missouri Division of Aging and later to the Missouri Department of Health and Senior Services which purported to correct deficiencies by assigning staff and purchasing and using equipment.

  i) Those records were false and fraudulent in that there was never any intent to abide by the plans of correction (e.g., physical hallway monitors patrolling the halls to protect patients); and

  ii) As soon as the State Inspectors left the facility the compliance with the plans of correction ceased.

  iii) Whenever state inspectors were due back in the facility, an effort would be made to return to the plans for the sake of fooling inspectors.

151) As a result of the creation of the false records, false claims were submitted to Medicare in amounts higher than should reasonably have been paid.

152) On the basis of the foregoing, the Treasury of the United States of America
sustained damage in an amount to be calculated at trial.

WHEREFORE, Relator Lorraine Shillcutt demands judgment against the
defendants jointly and severally in the amount of three times the overcharges submitted
for payment to the United States Government, for a civil penalty against the defendants
each jointly and severally in an amount between Five Thousand Five Hundred Dollars
($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. §
3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C.
§ 3730(d) of the False Claims Act or any other applicable provision of law, including any
applicable alternate remedy provisions, for its court costs and reasonable attorneys fees at
prevailing rates, for expenses, and for such other and further relief as this Court deems
meet, just and proper.

## COUNT IV
## VIOLATION OF 31 USC § 3729(A)(1)
## PRESENTMENT OF FALSE CLAIMS RELATING TO HOSPICE CARE

153) Relator restates, repleads, and realleges and incorporates by reference the contents
of paragraphs 1-129 as if fully set forth herein.

154) Defendants Shillcutt, DeStephane and the DeStephane Defendants have jointly
and severally submitted or caused others in their employ to submit claims for
reimbursement to Medicare in Missouri.

155) Those claims were presented to an officer or agent of the United States by
transmitting the claims for reimbursement to a fiscal intermediary for Medicare.

156) The claims were false in that they were based on a false certification that the
provider had complied with all applicable federal statutes and regulations.

157) The defendants failed to comply with the following requirements:

a) Patients are mandated to be free and able to select their choice of pharmacy provider, and patients were not given this choice.

b) Patents are mandated to be free to choose their own hospice provider, and this provider was mandated for them.

c) Facilities are required to comply with plans of correction as a condition of keeping their license, and the facility failed and refused to comply with its plans of correction, doing so knowing that this was a violation of the state and federal laws.

d) Facilities may not solicit nor may they receive any item of remuneration in cash or in kind for the furnishing of Medicare services, and if they do, they violate the Antikickback statute. Antikickback statutes were violated when:

    i) DeStephane or those acting on his behalf, Four Seasons Living Center, Richard Shillcutt, Reliant Care Group, Reliant Care Management Company, and the remaining DeStephane Defendants sought, received or accepted kickbacks from Reliant Care Levering LLC, or those acting on its behalf in exchange for referrals of patients to Levering for drug trials.

    ii) The Director of Nursing, Richard Shillcutt, Four Seasons Living Center LLC, or those acting on behalf of the DeStephane defendants in this case sought or received kickbacks from The Hospice of Jefferson City.

    iii) DeStephane or those acting on his behalf, Four Seasons Living Center, Richard Shillcutt, Reliant Care Group, Reliant Care Management Company, and the remaining DeStephane Defendants sought, received or accepted kickbacks from Pharmco Missouri, or those acting on its behalf.

    iv) DeStephane or those acting on his behalf, Four Seasons Living Center, Richard Shillcutt, Reliant Care Group, Reliant Care Management Company, and the remaining DeStephane Defendants sought, received or accepted kickbacks from Enduracare LLC, or those acting on its behalf.

158) Defendants, jointly and severally knew that the invoices submitted to Medicare were false in that:

   a) Defendants either knew directly that the claims were false; or

   b) Acted in deliberate ignorance of the truth or falsity; or

   c) Acted in reckless disregard of the truth or falsity of the claims.

159) As a result of billing Medicare for skilled nursing when the provider had falsely certified compliance with Medicare regulations and federal statutes Medicare paid claims it would not have paid had the provider application not been false or fraudulent.

160) On the basis of the foregoing, the Treasury of the United States of America sustained damaged in an amount to be calculated and proved at trial.

WHEREFORE, Relator Lorraine Shillcutt demands judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, including any alternate remedy, for its court costs and reasonable attorneys fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT V
## VIOLATION OF 31 U.S.C. § 3729(A)(3)
## AGAINST ALL DEFENDANTS NAMED
## CONSPIRACY TO SUBMIT FALSE CLAIMS
(Corporate Structure, Billing, False Certification)

161) Relator restates, repleads, and realleges and incorporates by reference the contents of paragraphs 1-129 as if fully set forth herein.

162) Richard Shillcutt, Richard J. DeStephane, Sharon Miller, The DeStephane Defendants, Rick Mofsen, DO, Clinical Research Inc., and others jointly and severally agreed to a plan whereby the DESTEPHANE DEFENDANTS, would submit false claims to Medicare and Medicaid for provision of Nursing Home Services.

163) The defendants conspired in the following manner:

   a) Richard J. DeStephane conspired with Richard Shillcutt, and agreed with him that Four Seasons Living Center, under Shillcutt's administration, would implement certain policies that would maximize Medicare and Medicaid reimbursement and improve cash flow at the facility.

   b) Sharon Miller and Reliant Care Management Company were directed by DeStephane to cooperate with and agree to furnish material support to the agreement between Shillcutt and DeStephane.

   c) The agreement was manifested, in addition to the agreements not committed to writing, by a writing promoting Shillcutt to a senior administrative position within Reliant Care Management Company and bumping his salary from less than $100,000 per year to in excess of $170,000 per year.

   d) Various agreements and various legal entities entered into relationships with Four Seasons Living Center and the remainder of the DeStephane Defendants, but at all times these corporate entities were the alter ego of DeStephane and he was

knowingly and willfully directing them in the orchestration of the fraudulent conduct that formed the basis for the conspiracy to submit false claims.

e) Agreements to submit false claims were entered into in both the professional and personal capacities of Shillcutt, DeStephane, and Miller.

f) One additional manifestation of the agreement to submit false claims was the agreement between DeStephane and Shillcutt for DeStephane to pay the $15,000 in legal fees that arose as a result of Shillcutt firing his wife and assaulting her.

164) This agreement had, at is core, an unlawful objective which was to maximize Medicare patient revenue by increasing costs and length of stay and prohibiting discharge until the maximum amount of eligibility had been used.

165) After entering into this Conspiracy and agreement, the parties took steps to conceal the nature and extent of the agreement from HCFA and the Office of Program Integrity.

166) After entering into this conspiracy and agreement, the DESTEPHANE DEFENDANTS falsely certified their Medicare and Medicaid Cost Reports, the documents which establish the rates and amounts that they will be paid for providing healthcare. Specifically, the DESTEPHANE DEFENDANTS certified that they complied with all federal requirements for participation in the Medicare and CHAMPUS programs and with all federal and state requirements for participation in the Medicaid program when they were not, in fact, in compliance.

167) The DeStephane Defendants and others all took acts in furtherance of the conspiracy, including but not limited to:

a) Taking the actions set forth above in paragraphs 163a – 163f.

b) Falsely creating internal records to track the improvements in revenue.

c) Communicating to staff at Reliant skilled nursing facilities that they were never to discharge a Medicare patient on a Friday.

d) Requiring Pharmco Missouri as the sole provider of pharmacy services.

e)    Requiring The Hospice of Jefferson City as the sole provider of hospice services.

f)    Paying and receiving kickbacks from other Reliant Care Group entities or physicians.

168)    At the time the defendants took the acts complained of above, they did so with the intent to defraud the government.

169)    As a result of the conspiracy and the billing  thousands of false claims for nursing home services were billed to Medicare and Medicaid that did not reflect the true costs and were in amounts grossly in excess of what should have been charged.

170)    On the basis of the foregoing, the Treasury of the United States of America sustained damage in an amount to be determined and proved at trial.

WHEREFORE, Relator Lorraine Shillcutt demands judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, including any alternate remedy, for its court costs and reasonable attorneys fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT VI
## VIOLATION OF 31 U.S.C. § 3729(A)(3)
## AGAINST THE DESTEPHANE DEFENDANTS
## AND CLINICAL STUDY DEFENDANTS
## CONSPIRACY TO SUBMIT FALSE CLAIMS
(Transfer of Patients to RLC, Payment of Kickbacks)

171) Relator restates, repleads, and realleges and incorporates by reference the contents of paragraphs 1-129 as if fully set forth herein.

172) Richard Shillcutt, Richard J. DeStephane, Sharon Miller, The DESTEPHANE DEFENDANTS, the CLINICAL STUDY DEFENDANTS, and others jointly and severally agreed to a plan whereby the DESTEPHANE DEFENDANTS, acting through RLC, would submit false claims to Medicare and Medicaid for provision of Nursing Home Services.

173) The defendants conspired in the following manner:

  a) Richard J. DeStephane conspired with Richard Shillcutt, Rick Mofsen, DO, Clinical Research, Inc., and Reliant Levering Care, LLC, and agreed with them that Four Seasons Living Center, under Shillcutt's administration, would locate patients who did not have family or who were cared for by the Public Administrator for transfer to RLC.

  b) Sharon Miller and Reliant Care Management Company were directed by DeStephane to cooperate with and agree to furnish material support to the agreement between the parties to the conspiracy.

  c) The agreement was manifested, in addition to the agreements not committed to writing, by a writing promoting Shillcutt to a senior administrative position within Reliant Care Management Company and bumping his salary from less than $100,000 per year to in excess of $170,000 per year.

d) Various agreements and various legal entities entered into relationships with Four Seasons Living Center and the remainder of the DeStephane Defendants, but at all times these corporate entities were the alter ego of DeStephane and he was knowingly and willfully directing them in the orchestration of the fraudulent conduct that formed the basis for the conspiracy to submit false claims.

e) Agreements to submit false claims were entered into in both the professional and personal capacities of Shillcutt, DeStephane, and Miller.

f) One additional manifestation of the agreement to submit false claims was the agreement between DeStephane and Mofsen to, on information and belief, pay kickbacks to DeStephane and Reliant Care Management Company for the patients identified for clinical studies.

174) This agreement had, at is core, an unlawful objective which was to maximize the number of patients available for geriatric behavior medicine studies without obtaining those individual's proper consent or the informed consent of their guardians or conservators.

175) The agreement also had the unlawful objective of providing a means for resident revenue to stay within the Reliant Care Group and/or Reliant Management Company, Inc., family of companies while permitting an affiliated company to draw from an expansive pool of behavioral medicine clients. At the core of this unlawful objective was the payment of kickbacks, in the form of reimbursement to Four Seasons of Medicaid and Medicare funds due to that facility, from Clinical Research Inc., as consideration for the transfer of the patients to Reliant Levering Care, LLC, for inclusion in the clinical study.

176) The scheme can be graphically represented as follows:



Figure Three: The relationship between defendants in the trading patients scheme.

177) After entering into this Conspiracy and agreement, the parties took steps to conceal the nature and extent of the agreement from HCFA and the Office of Program Integrity.

178) After entering into this conspiracy and agreement, the DESTEPHANE DEFENDANTS falsely certified their Medicare and Medicaid Cost Reports, the documents which establish the rates and amounts that they will be paid for providing healthcare. Specifically, the DESTEPHANE DEFENDANTS certified that they complied with all federal requirements for participation in the Medicare and CHAMPUS programs and with all federal and state requirements for participation in the Medicaid program when they were not, in fact, in compliance.

179) The DeStephane Defendants and others all took acts in furtherance of the conspiracy, including but not limited to:

a) Taking the actions set forth above in paragraphs 173a – 139f.

b) Falsely creating internal records to track the improvements in revenue.

c) Communicating to staff at Reliant skilled nursing facilities that they were to identify and single out those patients who had out of town family members or public administrators as guardians.

d) Paying and receiving kickbacks from other Reliant Care Group entities or physicians.

180) At the time the defendants took the acts complained of above, they did so with the intent to defraud the government.

181) As a result of the conspiracy and the billing thousands of false claims for nursing home services were billed to Medicare and Medicaid that did not reflect the true costs and were in amounts grossly in excess of what should have been charged.

182) On the basis of the foregoing, the Treasury of the United States of America sustained damage in an amount to be determined and proved at trial.

WHEREFORE, Relator Lorraine Shillcutt demands judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, including any alternate remedy, for its court costs and reasonable attorneys fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT VII
## VIOLATION OF 31 U.S.C. § 3729(A)(7)
## REVERSE FALSE CLAIMS AGAINST DESTEPHANE DEFENDANTS
(Failure of Care Allegations)

183)   Relator restates, repleads, and realleges and incorporates by reference the contents of paragraphs 1-129 as if fully set forth herein.

184)   From at least December, 2000 through the present, defendants have known, because of their citations by the State of Missouri, that they were providing worthless care to residents of Four Seasons Living Center and other homes in the Reliant Care Group, LLC, and Reliant Care Management Company chain of companies.

185)   On numerous occasions between December, 2000 and the present Defendants have been cited for violations of Chapter 198 and for violations of the Code of Federal Regulations (42 CFR § 483) by state and federal surveyors.

186)   In numerous cases care was so bad that patient's expired as a result of the negligence inherent in their care.  Aaron Crenshaw and Kelly Denise Leslie are two examples of these failures of care.

187)   Defendant, with respect to Crenshaw and Leslie and all patients for whom it was cited for substandard care:

   a)   Knew that the care provided"[failed] to meet professionally recognized standards of health care." See, e.g., 42 U.S.C. § 1320c-5(A)(2); 42 USC § 1320a-7b(a)(1)(3).

   b)   Knew that  they had failed to "care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident."  42 U.S.C. § 1396(r)(b)

   c)   Knew that the facility did not "operate and provide services in compliance with all applicable Federal, State and local laws and regulations and with accepted

professional standards and principles which apply to professionals providing services in a facility." 42 U.S.C. § 1396(r)(d)(4)(A)

188) Defendant thereby knew that it did not comply with preconditions for reimbursement under Medicare and Medicaid.

189) In spite of this, on information and belief, defendants received and accepted payments from Medicare and Medicaid for patients who received worthless care and for whom the facility knew it had not met the proper billing standards.

190) Defendants created false records, to wit, false CMS 1500, CMS 855A, false medical record entries, and false official reports of circumstances of death.

191) Defendants further used these false documents to conceal, avoid, or decrease their obligation to repay to the Treasury of the United States the amounts billed to Medicare and Medicaid between December 2000 and the present.

192) On the basis of the foregoing, the Treasury of the United States of America sustained damage in an amount to be determined and proved at trial.

WHEREFORE, Relator Lorraine Shillcutt demands judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, including any alternate remedy, for its court costs and reasonable attorneys fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

Respectfully submitted,


Respectfully submitted,

_Kl L DeWitt_ _by MDW #38328_
Edward D. Robertson, Jr.   Mobar #27183
Anthony L. DeWitt      Mobar # 41612
BARTIMUS, FRICKLETON ROBERTSON &
GORNY, P.C.
715 Swifts Highway
Jefferson City, MO 65109
(573) 659-4454
(573) 659-4460 (Fax)
aldewitt@sprintmail.com
chiprob@earthlink.net



Robert W. Russell    Mobar # 38116
KEMPTON & RUSSELL
114 East 5th St.
Sedalia, MO 65301
660-827-0314
660-827-1200 (Fax)


ATTORNEYS FOR RELATORS

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues for which a jury is available.

Respectfully submitted,

_A L DeWitt_  by mfdewit 38328

Edward D. Robertson, Jr.    Mobar #27183
Anthony L. DeWitt       Mobar # 41612
BARTIMUS, FRICKLETON ROBERTSON &
GORNY, P.C.
715 Swifts Highway
Jefferson City, MO 65109
(573) 659-4454
(573) 659-4460 (Fax)
aldewitt@sprintmail.com
chiprob@earthlink.net


Robert W. Russell    Mobar # 38116
KEMPTON & RUSSELL
114 East 5th St.
Sedalia, MO  65301
660-827-0314
660-827-1200 (Fax)


ATTORNEYS FOR RELATORS

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 9th day of February, 2006, a copy of the foregoing

Complaint and the required disclosure statement was served on the individuals below by

placing the same in the United States Mail, first class postage affixed, and addressed to

Cynthia Woolery and Alberto Gonzales, Esq., at the addresses below:


Cynthia Woolery
Assistant United States Attorney of the Western District of Missouri.
400 East 9th St., Suite 500
Kansas City, MO 64106


Hon. Alberto Gonzales, Esq.
Attorney General of the United States
5111 Main Justice Building
10th & Constitution Ave. N.W.
Washington, DC 20210

A L DeWitt by MDW #38328
_____
Attorney for Relator